COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-134-CV

 

 

IN THE
INTEREST OF E.H., E.W., 

AND E.H.                                                                                           

 

                                                    

 

                                                                                                        

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction








In three issues, Appellant Father complains that
the evidence is factually insufficient to support the trial court=s
nonpaternity finding and its decision to terminate his parental rights under
the endangerment grounds of section 161.001(1). 
See Tex. Fam. Code Ann. ' 160.201
(Vernon 2001), ' 161.001(1)(D), (E) (Vernon
Supp. 2009).  We affirm.

II.  Factual
and Procedural History

The trial court terminated Mother=s
parental rights to six children and the parental rights of the children=s
fathers; Mother and the other fathers do not appeal.  Father is the alleged father of three of
Mother=s
children:  Eileen, Eric, and Emily.[2]  Because Father challenges only the factual
sufficiency of the evidence to support the trial court=s
termination findings, we will address the evidence in greater detail below.

III. 
Factual Sufficiency  

A.  Standard of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subsection (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).








Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. '' 161.001,
161.206(a).  Evidence is clear and
convincing if it Awill produce in the mind
of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.@ Id. ' 101.007 (Vernon 2008).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96
S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243 S.W.3d 611,
616 (Tex. 2007) (contrasting standards for termination and modification).

 

In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s findings
and not supplant the judgment with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  Here, we must determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that Father violated subsection (D) or subsection (E) of section 161.001(1).  See Tex. Fam. Code Ann. '
161.001; C.H., 89 S.W.3d at 28. 
If, in light of the entire record, the disputed evidence that a
reasonable factfinder could not have credited in favor of the finding is so
significant that a factfinder could not reasonably have formed a firm belief or
conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d
at 108. 

 

 








B.  Endangerment Findings

In his second and third issues, Father argues
that the evidence is factually insufficient to support the trial court=s
findings that he endangered the children. 
See Tex. Fam. Code Ann. ' 161.001(1)(D),
(E).  Specifically, he contends that A[a]lthough
there was evidence [Father] used and dealt drugs, the evidence that he used or
dealt drugs around his three children was speculative [and] . . . [p]otentially
dangerous is not endangering by clear and convincing evidence.@[3] The State
responds that there is ample evidence to support the trial court=s
finding that Father=s extensive history of drug use
and drug dealing endangered the children.

1. 
Endangerment under Section 161.001(1)(D), (E)








Endangerment is defined as exposing to loss or
injury, to jeopardize.  In re J.T.G.,
121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.).  To support a
finding of endangerment, the parent=s
conduct does not necessarily have to be directed at the child, nor is the child
required to suffer injury.  Boyd,
727 S.W.2d at 533.  Rather, a child is
endangered when the environment or the parent=s course
of conduct creates a potential for danger that the parent is aware of but
disregards.  In re S.M.L., 171
S.W.3d 472, 477 (Tex. App.CHouston
[14th Dist.] 2005, no pet.).  

Under subsection (D), it is necessary to examine
evidence related to the child=s
environment to determine if it is the source of endangerment to the child=s
physical or emotional well‑being. 
In re D.T., 34 S.W.3d 625, 632 (Tex. App.CFort
Worth 2000, pet. denied).  Inappropriate,
abusive, or unlawful conduct by persons who live in the child=s home
or with whom the child is compelled to associate on a regular basis in his home
is a part of the  Aconditions
or surroundings@ of the child=s home
under section 161.001(1)(D).  In re
J.L.W., No. 02-08-00179-CV, 2008 WL 4937970, at *6 (Tex. App.CFort
Worth Nov. 20, 2008, no pet.) (mem. op.); see also In re W.S., 899
S.W.2d 772, 776 (Tex. App.CFort
Worth 1995, no writ) (stating that Aenvironment@ refers
not only to the acceptability of living conditions, but also to the parent=s
conduct in the home). 








Under subsection (E), the relevant inquiry is
whether evidence exists that the endangerment of the child=s
physical or emotional well‑being was the direct result of the parent=s
conduct, including acts, omissions, and failures to act.  J.T.G., 121 S.W.3d at 125.  Termination under subsection (E) must be
based on more than a single act or omission; a voluntary, deliberate, and
conscious course of conduct by the parent is required.  Id.; D.T., 34 S.W.3d at
634.  A[A]
parent=s use of
narcotics and its effect on his or her ability to parent may qualify as an
endangering course of conduct.@  J.O.A., 283 S.W.3d at 345 & n.4; see
also In re S.K.A., No. 10-08-00347-CV, 2009 WL 2645027, at *9 (Tex. App.CWaco
Aug. 19, 2009, no pet.) (mem. op.) (holding that father=s
failure to take any action to protect unborn child from mother=s drug
use was sufficient to establish that he knowingly allowed the child to remain
in conditions and surroundings that endangered the child=s
physical well-being); In re M.J.M.L., 31 S.W.3d 347, 351B52 (Tex.
App.CSan
Antonio 2000, pet. denied) (holding that evidence of course-of-conduct
endangerment was legally sufficient when it showed that father knew mother was
a drug addict who used drugs while pregnant and that he abandoned
soon-to-be-born baby to her care). 













To determine whether termination is necessary,
courts may look to parental conduct occurring both before and after a child=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).  Evidence of how a parent has treated another
child or spouse is also relevant in determining whether there is an endangering
course of conduct under section 161.001(1)(E). 
D.T., 34 S.W.3d at 637. 
Drug abuse during pregnancy constitutes conduct that endangers a child=s
physical and emotional well‑being. See In re W.A.B., 979 S.W.2d
804, 806 (Tex. App.CHouston [14th Dist.] 1998, pet.
denied) (upholding termination when mother used illegal drugs during and after
pregnancy), disapproved of on other grounds, J.F.C., 96 S.W.3d at 267
n.39; see also In re A.O., No. 02-09-00005-CV, 2009 WL 1815780, at *4B5 (Tex.
App.CFort
Worth June 25, 2009, no pet.) (holding evidence legally and factually
sufficient under subsections (D) and (E) when father used illegal drugs before
going to prison, admitted to using cocaine with mother, and knew mother used
illegal drugs during and after pregnancy but failed to take steps to protect
child).  Conduct that subjects a child to
a life of uncertainty and instability also endangers the child=s physical
and emotional well‑being.  See
In re S.D., 980 S.W.2d 758, 763 (Tex. App.CSan
Antonio 1998, pet. denied) (using illegal drugs and violating parole provided
sufficient evidence of endangerment). 
While imprisonment alone is not a basis to terminate a parent=s
rights, it is an appropriate factor to consider because when a parent is
incarcerated, he or she is absent from the child=s daily
life and unable to provide support to the child, negatively impacting the child=s living
environment and emotional well-being.  See
S.M.L., 171 S.W.3d at 478B79 (AAppellant=s most
recent assault on a police officer is particularly significant because he
committed the crime knowing that, as before, it would result in his
incarceration, thus leaving his young daughter without his support and in the
care of a mentally ill mother with questionable parenting abilities.@).

Because the evidence pertaining to subsections
161.001(1)(D) and (E) is interrelated, we may conduct a consolidated
review.  In re M.C.T., 250 S.W.3d
161, 169 (Tex. App.CFort Worth 2008, no pet.).

2. 
Evidence

Father did not attend the termination trial.[4]  Dr. Nichelle Wiggins, a clinical psychologist
who met with Father and Mother separately, testified at the trial, as did Penny
Smith, a Child Protective Services (ACPS@)
investigator, Adelia Robertson, a Family Based Social Services (AFBSS@)
worker, and Ashley Moore, the ongoing CPS caseworker.  Dr. Wiggins=s
reports on Father and Mother were admitted in evidence. 








When Dr. Wiggins saw Father in December 2008 for
his psychological evaluation, he was thirty years old and had a total of four
children, ages eight, six, six, and one, with Mother and with another woman.[5]  By the termination trial, Father had five
children.  Father married Mother in
February 2008.  The three children at
issue here are the children with Mother: 
Eileen, born in 2002, Eric, born in 2007, and Emily, born in 2009.

Dr. Wiggins described Father=s
demeanor during his psychological evaluation as follows:

[H]e told me he did not need to be seen by this
examiner, and he used some choice words, profanity, . . . .  He was true to himself throughout the
interview, and he cursed quite frequently, soCand he
didn=t just
use the milder versions of the words.  He
used some really strong words.  So I just
let him be himself, and, but I did find a need to quote some of his behaviors
because it demonstrated some of the lack of impulse control and the social
mores that were not being demonstrated. 
. . . [T]his is the way he described himselfChe says
he does drugs, he sells drugs, and until he=s ready
to change, it will not happen.  [Emphasis added.]

She stated that Father said that he dealt drugs in 2008, but A[j]ust
enough to make enough money.  Nothing
like he used to do.@ 
Her report states that Father sold drugs heavily from 1999 to 2003.








Father admitted to Dr. Wiggins that he had a drug
problem and that he had been addicted to cocaine since he was fifteen.  Dr. Wiggins testified that Father told her
that his two drugs of choice were cocaine and heroin, that he usually used them
together, that he had used them the day before the evaluation,[6]
and that he used them daily in amounts between $30- and $50-worth.  He added that he does not pay for the drugs;
he asks for drugs from others with the promise to pay them back.  Dr. Wiggins described Father as stating:

He only does heroin and cocaine, and that=s in
quotes, and he said he used in the form of speedballs, so he was minimizing at
that point.  When somebody says [A]only[,A] and he=s
talking about heroin and cocaine, I knew then that I was dealing with a person
who is saying [A]I have a drug problem but I don=t have a
problem in the way that CPS says I do, and I don=t need
to get the kind of treatment everybody is saying, but I do.[A]  So he was so confused, but I=m not
surprised by that, because that often goes along with people who are active in
their addiction, so once that type of conversation starts, I=ll try
to find out, well, [A]how do you think it impacts the
children, your drug use,[A] and that=s when
he basically felt like he was doing those drugs to himself, the children were
not being exposed to those drugs, so he can do whatever he wants to to his own
body, but he did not feel like he was harming his children.  [Emphasis added.]








In her report, Dr. Wiggins noted that Father said
his children never saw him use drugs and Awhen he
used, he was in a different room.@  He added that he did not think his selling
drugs put the children in any danger and that his drug use did not affect the
children Abecause they don=t do it.@  He told Dr. Wiggins that his step-children
had seen him selling drugs, and that he was open to in-patient treatment but
could not fit it into his schedule at the time. 
Dr. Wiggins recorded the following statement from Father about his
relationship with the children:

He stated his children know he loves each and
every one of them. [Father] stated he and the children play together and go to
parks and to the store together as well as they talk and laugh with each
other.  [Father] stated he knows his
relationship with his children and stepchildren is wonderful.  [Father] indicated the methods he uses when
disciplining his children is have them stand in the corner, he spanks, uses
time-out, restricts activities of any kind, and will have the older ones study
all day.








Dr. Wiggins also testified that Father told her
about his history of arrests and incarceration. 
He had been to jail about twenty-five timesCincluding
five possession-of-a-controlled-substance arrests in 2001, 2002, and 2003 (two
charges dropped); an arrest for murder in 2001 (charge dropped); an arrest for
assault (family violence) involving the other mother that resulted in two years=
probation; and unlawfully carrying a weapon in 1996 and 2000.  The 1996 weapons charge involved a cane that
turned into a sword, which he used when he was Agang-banging.@[7]  Father and his mother Awere
locked up for possession of a controlled substance in April of 2003[;] his
mother got [ten] years and he got five years.@  He was released in 2005 but went back seven
months later for possession of heroin, for sixteen months.  He was released in February 2007, went back
to jail for a parole violation on July 26, 2008, was released August 22, 2008,
and Agot off
parole and a leg monitor on September 19, 2008.@  Father was released from county jail on June
5, 2008, the day CPS removed the children from Mother for violating the safety
plan.








Father described to Dr. Wiggins his history of
anger outbursts and how he goes through cycles of depression;[8]
he told Dr. Wiggins that Aif his parental rights were
terminated, he would act out in such a way to where the authorities would have
to kill him.@ 
Dr. Wiggins stated that Father had a mood disorder and Aa clear
antisocial personality disorder . . . [h]e=s
narcissistic:  The world is about him,
what can he get out of relationships, lack of empathy, just very self-focused,
very self-centered-type personality, and it comes out in his way he relates
with others.@ 
She stated that a prime example of Father=s
narcissism was that Ahe does not see how his drug
activity, drug problems, can have any effect on his children because it=s all
about him, he=s doing it to himself, they=re not
harmed in any way.@ 
Dr. Wiggins noted that Father indicated he was willing to do anything he
needed to get his children back, but his behavior indicated otherwise.[9]








Moore, the ongoing CPS caseworker, testified that
she spoke with Father about the service plan about six times and that Father
was incarcerated for a parole violation for about a month while she had the
case.  She testified that Father attended
eleven of around thirty possible visits with the children, that he arrived late
to the visits on more than one occasion, and that he appeared to be under the
influence of drugs at times.  She
testified that Father attended two of the individual counseling classes but
that the therapist reported that Father was untruthful during these
classes.  Father did not complete a drug
assessment.  He attended only two
parenting classes and participated in one drug test, although Moore requested
five drug tests.  The parties stipulated
that Father=s hair-follicle test was positive
for cocaine, heroin, and other drugs on December 4, 2008.  The termination trial occurred four months
later, on April 13, 2009.








Moore testified that Father has not been able to
show that he has a safe, stable, and appropriate home for the children[10]
or any documentation that he is gainfully employed.[11]  She testified that the children did not
appear to be bonded with Father when he visited.  She also testified that, with regard to both
parents, she was concerned about Atheir
ongoing drug use, the apparent refusal to participate in treatment, and the
lack of services completed, their inability to maintain contact with [Moore],
and their indifference to their visits.@ She
testified that neither Mother nor Father could adequately provide for the
children=s
physical, emotional, mental, and spiritual needs and that it would be in the
children=s best
interest to terminate Mother=s and
Father=s
parental rights. 

We must also review the evidence pertaining to
Mother, because Father knowingly placed or knowingly allowed the children to
remain with Mother, whose conduct and environment the trial court also found
endangering.  The trial court also found
that Mother was the cause of a child being born addicted to alcohol or a
controlled substance under family code section 161.001(1)(R).  Eric and Emily were both born positive for
cocaine.








Dr. Wiggins evaluated Mother, a
thirty-two-year-old drug addict, in September 2008 and gave Mother=s
extensive, drug-related history at trial.[12]
Mother described herself to Dr. Wiggins as a regular marijuana user and stated
that she used marijuana, cocaine, and heroin two days before the psychological
evaluation.  Mother became involved with
the father of her two oldest children when she was fourteen; he physically and
emotionally abused her (including a concussion and fractured skull) and
eventually went to jail for aggravated robbery with a deadly weapon when he was
nineteen.  When she was twenty-one, she
became involved with the father of her third-oldest child and relapsed into
drug use (cocaine and marijuana) when she was pregnant with that child; she
described that man as a physically abusive crack cocaine user, but she added
that she fought him back.








Mother=s
children with Father are six-year-old Eileen and eight-month-old Emily.  She had a relationship with another man, a
married crack cocaine user, while Father was incarcerated, and she told Dr.
Wiggins that this man fathered her sixteen-month-old child, Eric.  Mother admitted that Eric was born positive
for cocaine and that she had been using cocaine and marijuana while pregnant
because A[s]he
was depressed . . . [and] could not believe that she was pregnant with yet
another child.@ 
She was also charged with drug possession and went to jail during the
pregnancy.  Dr. Wiggins testified that
Mother recognized that she was depressed and needed treatment for her
addiction. Mother stated that she used cocaine daily in 2007, but she also
stated that her children never knew she used drugs.

Dr. Wiggins testified that Mother admitted having
been arrested for possession of marijuana and crack cocaine in 2001 and 2006
because she was selling drugs and trying to make some money, and that she had
been to jail around six times.  Mother
has also been arrested for domestic violence. 
Dr. Wiggins described Mother as having mental health issues, including
post-traumatic stress disorder from physical and sexual abuse, compounded by
substance abuse issues.  Mother also
reported having auditory and visual hallucinations; Dr. Wiggins testified that
she was unsure whether this was a psychotic episode or because of Mother=s drug
use.

Dr. Wiggins testified that Mother said she
thought she and Father were doing a good job with the children and that this
indicated that Mother was in denial because:

This is a lady who has
exposed her children to an environment in which there is drug useCeven though she said they
never saw her use, she was under the influenceCand in her mind, because
they were not being physically or sexually abused, she felt like she was giving
them a different environment than her mother had given her . . . .  I did not get [the] opportunity to visit with
the children to see if that was accurate or notCbut in her mind, because
they did not have those experiences that she had, she felt like she was not
being neglectful.








Dr. Wiggins gave similar testimony about Father, stating, AHe did
not connect [his and his mother=s drug
use] to his children, because he said he never used in front of his children,
so he felt like since his children had not seen him use that he was giving them
a different environment than his mother gave him.@ 

Smith, the CPS investigator, testified that she
met Mother in December 2007 after Eric tested positive for drugs at birth.  She testified that Mother admitted using
cocaine two weeks before giving birth. 
Robertson, the FBSS worker, met with Mother after Eric was born; Mother
admitted to her that she had been using cocaine and marijuana and wanted help
dealing with her dependency.  Several
months later, she located Mother at a Motel 6; Mother had Eric and two of her
other children with her in violation of the safety plan. At that time, Mother
admitted to using cocaine, opiates, and amphetamines. The children were removed
and placed into foster care. Robertson testified that Mother never started any
of the FBSS services although the agency offered to provide transportation for
her.

Moore, the ongoing CPS caseworker, testified that
she provided Mother with a service plan in August 2008, gave her a written copy
of it twice, and discussed it with Mother approximately twelve times.  Like Father, Mother failed to complete her
service plan. 








With regard to Father and Mother together, Dr.
Wiggins testified that they exacerbated each other, and 

that was one of the
things that was interesting, because both of them came from parents, mothers,
who were drug abusers, and they described very similar types of
environments.  They had different
outcomes in terms of one had been sexually and physically abused and the other
went towards conduct disorders with gang activity, but they ended up both
having emotional issues and substance dependence and legal problems.

 

She testified that the probability was high that both parents, who
admitted to daily drug use, were under the influence of drugs when the children
were around, and that she Awould be
very concerned about their ability to provide a safe home and parent their
children effectively if they haven=t gone
through the treatment process.@  Dr. Wiggins testified that both Mother and
Father admitted to selling drugs in 2008. 
She stated that Father told her that neither Mother nor Father could get
an apartment in their names due to their criminal backgrounds.  She stated that Mother told her that Father
had gotten in trouble before for selling drugs but denied Father had ever used
drugs.

 

3. 
Analysis








Father challenges the factual, but not the legal,
sufficiency of the evidence to support the trial court=s
endangerment findings.  Under the
circumstances presented hereCthat is,
Father=s own
history of drug use, drug dealing, crime, and incarceration; his denial that
his drug use and dealing affected the children; his knowledge that the other
mother of his child used methadone while pregnant; and his leaving Eileen,
Eric, and Emily (unborn when CPS intervened) in Mother=s care,
with her own history of drug use and crimeCwe
conclude that the trial court could have reasonably formed a firm conviction or
belief that Father endangered his children under subsections (D) and (E).  See Tex. Fam. Code Ann. '
161.001(1)(D), (E); C.H., 89 S.W.3d at 28.  Therefore, we hold that the evidence is factually
sufficient to uphold the trial court=s
endangerment findings.

C.  Nonpaternity Finding

In his first issue, Father challenges the trial
court=s
nonpaternity findingCspecifically, he complains that
the evidence is insufficient to support the trial court=s
finding that he did not admit or establish paternity because he acknowledged in
his request for counsel that he was the children=s parent
and referred to himself as ARespondent
Father@ in his
answer.  The State concedes that this
would suffice to establish his paternity. 
However, because of our resolution of his second and third issues, we
need not address this issue.  See
Tex. R. App. P. 47.1.

 

 








IV. 
Conclusion

We affirm the trial court=s
judgment.

 

PER CURIAM

PANEL: MCCOY, GARDNER, and WALKER, JJ.

DELIVERED: February 11, 2010

 











[1]See Tex. R. App. P. 47.4.





[2]We use aliases for the names of the
children.  See Tex. R. App. P.
9.8(b)(2).





[3]Although the State argues
that section 263.405(i) precludes Father=s appeal, we have previously held section
263.405(i) unconstitutional.  See In
re D.W., 249 S.W.3d 625, 640, 642B45 (Tex. App.CFort Worth) (holding that section 263.405(i) is
unconstitutional because it unduly interferes with the appellate court=s substantive power to
rehear and determine issues on the merits that were decided in the court
below), pet. denied, 260 S.W.3d 462 (Tex. 2008).  Furthermore, the Texas Supreme Court has also
held that section 263.405(i) is unconstitutional Awhen it precludes a
parent from raising a meritorious complaint about the insufficiency of the
evidence supporting the termination order.@  In re
J.O.A., 283 S.W.3d 336, 339 (Tex. 2009). 






[4]Mother did not attend the
termination trial, nor did any of the other alleged fathers.  The father of Mother=s oldest two children was
incarcerated and unable to attend.  One
of the alleged fathers signed an affidavit of relinquishment.





[5]According to Dr. Wiggins=s report, Father became
involved with Mother when the other woman went to jail.  His six-year-old children are five months
apart in age because when the other woman Agot out of jail she got pregnant by him@; the other is Mother=s.  He was involved with the other woman for
eleven years and she is his eight-year-old=s mother; their home was foreclosed upon when
they were together. His six-year-old child with the other woman Awas exposed to methadone
because [she] was on methadone treatment while pregnant with him.@





[6]Dr. Wiggins noted that
six hours is usually enough time to complete her psychological evaluation
unless the patient is cognitively slow, i.e., suffers from severe learning
disabilities or a brain injury, or the patient is under the influence of
drugs.  Father did not complete the
evaluation that day, and he failed to return the following day to complete the
evaluation.





[7]Father was raised by his
mother, who had an extensive drug history. 
He was eleven when he joined a gang but quit being active with the gang
at seventeen.  He started selling and
using drugs at around age twelve; he took care of his younger siblings with the
money he would make selling drugs.  He
and his mother started using drugs together when he was nineteen. He did not
finish high school, but he received his GED while incarcerated.





[8]Dr. Wiggins=s report stated:

 

[Father] also endorsed a number of symptoms of anger such as still
being angry about things that have happened to him in the past, feeling tense a
lot of the time, people often telling him to calm down, getting angry really
fast, and getting into frequent arguments. 
He also reported his anger sometimes frightens others and his anger has
caused problems with the police before. 
[Father] indicated he has used alcohol and drugs to feel better when he=s angry and yet, he
denied needing help to manage his anger. [Father] also described severe mood
swings but again it=s unclear the extent the
drug use has had on his current state of mind. [Father] reported . . . thoughts
of death and dying quite a bit and his feelings can be easily hurt and he feels
like others are not giving him proper credit for his achievements.  [Father] at one point even indicated that he
feels like walking away much like his father [did] . . . over his situation
with his children . . . but he hangs in there and he keeps trying despite the
fact that he is still using drugs. 
[Father] is a confused individual who is saying on the one hand he wants
treatment but on the other hand his behaviors are indicating otherwise.





[9]Dr. Wiggins added that
she was concerned for her safety during her interview with Father, stating, 

 

I was cautious not to irritate him too much.  With the way he was loose with his language
and the threat he had made about if he doesn=t get what he wants and his rights get terminated
he=s going to act out in
such a way, soCand then he had told me
he had used the day before, so irritability is real common, so I was careful
with this man. . . .  I did not want to
irritate him and get him upset with me by telling [him] all these things I was
going to recommend him to do, and that was the last thing he wanted to hear,
because he didn=t think he needed to be
there to see me to begin with.





[10]Dr. Wiggins=s report reflects that
Father lost his apartment in 2008 Abecause the [landlord] said he had too much
traffic because he admitted to selling drugs >a little in order to
survive[.]=@  By trial, he was living with Mother and his
aunt in a one-bedroom apartment; the apartment is in his aunt=s name. 





[11]Dr. Wiggins=s report stated that
Father worked for a temporary staffing agency, assigned to a warehouse, and
that this was his first Alegitimate@ job. He had been fired
from a roofing job when he went to sleep on the roof Aand was coming down off
drugs when it happened . . . . [He] stated he had celebrated coming off the leg
monitor and then went to work the first day on the job and was fired.@





[12]Like Father=s mother, Mother=s mother had a drug
problemCMother=s two younger brothers
were born addicted to crack cocaine.  Her
mother=s boyfriend started
physically and sexually abusing Mother when she was eleven and impregnated
Mother when she was thirteen; she had an abortion at fourteen.  At sixteen, she was using drugs; she did not
finish high school.